## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

Case No. 2:25-mj-00977 DBP

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
THE CELLULAR DEVICES ASSIGNED
TO ████████0388 (TARGET CELL-1).

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Chad A. Jones being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with cellular device assigned to ██████0388 (TARGET

CELL-1) that are stored at premises controlled by Verizon, a wireless telephone service

provider headquartered at 1095 6th Avenue, New York, New York, United States. The

information to be searched is described in the following paragraphs and in Attachment A.

This affidavit is made in support of an application for a search warrant under 18 U.S.C. §

2703(c)(1)(A) to require Verizon, to disclose to the United States copies of the

information further described in Section I of Attachment B.  Upon receipt of the

information described in Section I of Attachment B, United States authorized persons

will review the information to locate items described in Section II of Attachment B. Preservation letters were previously submitted to Verizon.

2.      Your affiant is a duly sworn law enforcement officer employed by the Utah Transit Authority Police Department (UTAPD).  I have served in law enforcement since May 1998. I am currently assigned full-time to the Federal Bureau of Investigation (FBI) as a Task Force Officer (TFO) and Special Deputy United States Marshal, a position I have held since December 2023.  I am presently assigned to the Joint Terrorism Task Force (JTTF) in Salt Lake City, Utah, where I participate in investigations involving both domestic and international terrorism.  In this capacity, I have gained extensive experience in working with confidential informants and cooperating witnesses, conducting physical and electronic surveillance, executing search and arrest warrants, and collecting and analyzing evidence related to complex criminal and counterterrorism investigations.  My duties have afforded me a comprehensive understanding of interagency coordination and federal investigative procedures related to violations of federal criminal statutes.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

4.      Based on the weight of evidence against the defendant and facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 844(i)

[Attempted Arson in Interstate Commerce] and 26 U.S.C. § 5861(d) [Possession of a Destructive Device] have been committed.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

## PROBABLE CAUSE

5.     On or about September 12, 2025, at approximately 4:15 A.M. an unknown individual ("UNSUB") placed an incendiary destructive device—a 2.5 gallon plastic gas can with a lit multi-foot-long fuse, underneath the rear bumper and gas tank of a marked vehicle for KSTU Fox 13 television news station, located at 5020 Amelia Earhart Dr., Salt Lake City, Utah, 84116 (the "INCIDENT LOCATION").  After lighting the fuse, the UNSUB fled eastbound on foot.  The fuse "self-terminated" prior to reaching the gasoline in the can, and the device did not detonate.  At approximately 6:54 A.M., an employee of the television station notified the Salt Lake City Police Department of a suspicious device parked underneath one of the station's vehicles.

//

//

//

3





**Images 1 and 2**





**Images 3 and 4**

6.      Responding officers immediately identified the incendiary destructive device. Local detectives, local and federal bomb technicians, and arson investigators also responded to the scene. Bomb technicians and arson investigators confirmed the 2.5-gallon red plastic gas can, had "cannon fuse" running through the gas cap into the can (see Images 3 - 4).  The device was found directly underneath rear bumper and gas tank of the marked vehicle (see Images 1 - 2).  A multi-foot long burn trail along with the "self-terminated" remaining fuse was observed (see Image 4). The device was approximately three-quarters full of a liquid when recovered.  That liquid was field-tested and determined to be gasoline.

7.      Upon inspection technicians and investigators made the preliminary assessment that the device would constitute an incendiary destructive device pursuant to 26 U.S.C. § 5845.  The FBI Laboratory's Explosive Unit reviewed photographs of the device and preliminarily determined the device to be consistent with an Improvised Incendiary Device ("IID") and that the IID would meet the technical elements of an incendiary destructive device.

## SECURITY FOOTAGE
## EARLY MORNING SEPTEMBER 12, 2025

8.      Responding state officers and federal special agents canvassed the surrounding neighborhood for security camera footage. Multiple videos were recovered and submitted to the Salt Lake City Police Department.  Security camera footage depicted

the following information (all times approximate[1]).

9.    Agents reviewed footage titled "fragment_08_20250912035959.mp4" from a neighboring business. This video footage depicts the UNSUB, at 4:09:46 A.M., wearing dark pants, carrying multiple bags, walking from the west toward the INCIDENT LOCATION.  Upon reaching the news vehicle, the UNSUB stopped, placed an item under the vehicle, and is believed to then lay out the fuse, which appears to already be attached to the device. According to the video, the UNSUB ignited the fuse at 4:10:27 A.M., the gets up and jogs eastbound, away from the device and, consequently, out of the camera frame. The fuse continued to burn, with the video depicting light flickering from the general area of the fuse until 4:15:11 A.M., when it appeared to self-terminate. Approximately twelve employees were in the Fox 13 news building by 4:00 a.m. with eighteen additional employees randomly arriving prior to the 5:00 a.m. broadcast.

//

//

---

[1] The cameras from the multiple businesses did not have synchronized times.  As such, the times listed are those native to the recording reviewed.



**Image 5**

10.     Agents reviewed footage from the file titled "admin_20250912_031357-031435_5789326648_ch7_3." At 3:14:01[2] A.M., an individual wearing dark pants, dark sweatshirt with hood and gloves is depicted. He is wearing a backpack, carrying a red gas can, and carrying what appears to be a long, dark umbrella. The individual appears to wear a mask with a reflective surface and to have a long facial beard. The UNSUB's face is not in frame, however. The individual is observed continuing eastbound out of the frame.

---

[2] The time on the camera was approximately one hour behind local time.



**<u>Image 6</u>**

11.     Agents reviewed surveillance footage file titled "PTZ East_20250912040217" which depicts UNSUB walking southbound along Charles Lindbergh Drive east of a hotel at approximately 4:23 A.M.  The UNSUB continued southbound along Charles Lindbergh toward Interstate 80 when the UNSUB excited the video frame.

//

//

9

## IDENTIFICATION OF PROCTOR,
## PROCTOR'S VEHICLE, AND
## SUBJECT RESIDENCE

12.     The gasoline can, which was recovered on September 12, 2025, was processed for DNA and fingerprint evidence by the Utah Bureau of Forensic Services. Three DNA profiles were found on the gas can.  On the evening of September 15, 2025, DNA recovered from the gasoline can "screw ring" positively matched a record within the State DNA Index System database.  This match was to Christopher Solomon PROCTOR ("PROCTOR"), date of birth ███1980.

13.     A search of the Utah Motor Vehicles Division databases indicates PROCTOR is the registered owner of a 2004 Honda CRV, with Utah license plate ██████ ("the CRV").  The CRV was registered to the SUBJECT RESIDENCE.

14.     Following identification of PROCTOR's DNA on the gas can, a Salt Lake City Police officer ran the CRV on the city's license plate reader system (LPR). According to the LPR, PROCTOR's CRV was identified traveling northbound on N. 5600 W., between Interstate 80 to the south and Amelia Earhart Dr., at 4:30:23 A.M. Review of surveillance footage from a nearby gas station indicates the CRV made a U-turn at Amelia Earhart between 4:30 and 4:32 A.M.[3]  Agents reviewed maps of the area, and determined the gas station was located .9 miles from the INCIDENT LOCATION.

---

[3] N. 5600 W. is the exit off Interstate 80 immediately west of where the UNSUB was walking toward at 4:23 A.M.

15.     At 4:43:52 A.M., Proctor's CRV was captured on LPR in the vicinity of 2221 S. 1300 E., Salt Lake City, approximately 1.2 miles away from the SUBJECT RESIDENCE. Agents reviewed mapping data, which indicates the 4:43 A.M. capture was situated along the most logical route between the 4:32 A.M. direction of travel and the SUBJECT RESIDENCE.

16.     FBI Surveillance Units observed the CRV at the SUBJECT RESIDENCE on September 17, 2025.  PROCTOR was seen entering the CRV at the SUBJECT RESIDENCE.  Later that same day, the CRV was driven to a local auto dealership, where the vehicle remained.  An FBI agent investigated the vehicle from the exterior, and did not observe any items that appeared related to the attempted arson in plain view.

## PROCTOR PURCHASES SIMILAR ITEMS WORN BY UNSUB AND DELIVERED TO SUBJECT RESIDENCE

17.     Agents reviewed records provided by Amazon regarding PROCTOR, which listed the SUBJECT RESIDENCE, and cell phone number ███████0388[4], on the account as of May 2025. On or about August 22, 2025, PROCTOR purchased "First

---

[4] Records provided by Verizon indicated that the subscriber of this cell phone number was J███ C███████ whose driver's license has indicated the SUBJECT RESIDENCE since approximately 2012.  The cell phone was listed as an Apple iPhone with IMEI ████████0477.  A police report from the Asheville, NC Police Department dated August 31, 2025, in which PROCTOR made a complaint, listed this cell phone number as his telephone number in the complaint. Public records similarly indicated PROCTOR was the user of this cell phone. Utah driver's license records listed this cell phone number as PROCTOR's phone number.

Tactical Slach & Flash HRD Knkl Gl.," which are described as tactical gloves. The order was completed on August 27, 2025, and shipped to the SUBJECT RESIDENCE.  Agents reviewed the Amazon listing of the gloves, which describe the gloves as featuring, "a Nomex jersey with flame resistant silicon overprint…"

18.    At the same time, PROCTOR purchased "Ace Martial Arts Supply Ninja Tabi Boots, Black Jikatabi (Outdoor Tabi)" which also shipped to the SUBJECT RESIDENCE (see Image 9).  Agents reviewed the Amazon listing for those boots, and determined the boots featured a "split toe design." A photo of the split toe boot is below. In reviewing surveillance footage video titled, "admin_20250912_031357-031435_5789326648_ch7_3," I reviewed images of the UNSUB, which appear to show the UNSUB wearing split toe boots (see Images 7 – 8).

//

//

//



**Images 7 and 8**

//

//



**Image 9**

19.    According to records provided by Amazon, the items purchased on

August 23, 2025, described above, were purchased from IP address

█████████3.160.  The IP address was serviced by Google at the time of the August

23, 2025, purchase.  According to records obtained by Google, the IP address

returned account information with a name of J█████ B████████

("B██████████")[5] and a street address of "████████████████" which is the

SUBJECT RESIDENCE.

---

[5] Believed to be an associate of PROCTOR who also resides at the SUBJECT RESIDENCE.

## PROCTOR OBSERVED RETURNING
## TO THE INCIDENT LOCATION

20.    Further review of purchase records revealed that on September 16, 2025, PROCTOR ordered additional "green and orange" fuse.  On September 19, 2025, the newly procured fuse was delivered the SUBJECT RESIDENCE.  That same day an FBI surveillance team observed PROCTOR return to the vicinity of the INCIDENT LOCATION.  Specifically, PROCTOR was observed driving a silver-colored Porsche bearing Utah license plate number ███████ ("█████████").  A review of Utah state records indicated that ████████ is currently registered to J████████ B████████ at the SUBJECT RESIDENCE. PROCTOR departed the SUBJECT RESIDENCE in ████████ and traveled to the vicinity of 1995 S. 4490 W, Salt Lake City, UT, 84104. Shortly thereafter, PROCTOR was observed departing the area and driving to the vicinity of the INCIDENT LOCATION where he was observed driving slowly and passing the Fox 13 building several times before departing and returning to the SUBJECT RESIDENCE.

## SUBSEQUENT SEARCH OF
## SUBJECT RESIDENCE AND TARGET CELL-1

21.    On September 20, 2025, Special Agents with the FBI executed search warrants issued in the United States District Court for the District of Utah by the Honorable Chief Magistrate Dustin B. Pead.  The warrants were for the SUBJECT RESIDENCE, and PROCTOR's vehicle.

15

22.    During a lawfully executed search warrant, agents discovered and seized several items determined to be within the scope of the warrants.  Included in the items seized were black ninja boots, which appear to be similar to the boots worn by the individual captured on surveillance footage of the attempted arson, an empty gas can with a hole carved in the top, a portion of a multicolored fuse that appeared to be similar to the fuse used in the attempted arson, tactical gloves, a false wig and beard, .22 caliber ammunition, and TARGET CELL-1, among other items (see Images 10 – 17).



**Image 10**

//


//





**Image 11 - 13**

17



**Image 14**





**Images 15 - 17**

## PROCTOR'S USE OF TARGET CELL-1

23.     During the examination of TARGET CELL-1, investigators determined that on or about May 6, 2025, FAMILY MEMBER-1 texted PROCTOR, informing him that, "your fuse just go here" and PROCTOR replied, "I guess our operation is getting close now."  PROCTOR sent a text subsequent message to an acquaintance on July 13, 2025, at 11:43AM, PROCTOR stated:

> I'm going to start sending you instructional videos on really cool things, like how to make thermite… [A minute later, PROCTOR states] . . . I also think you should download an app where we can talk freely without being spied on by the cops and the FBI. Lol"

24.     Further examination of TARGET CELL-1 reveals PROCTOR using WhatsApp, an encrypted communications platform. Based on my training and experience, I know that thermite can be used in incendiary weapons and is composed of a mixture of metal powder and a metal oxide. When ignited, thermite produces molten metal and extreme heat.  Furthermore, co-conspirators will often use end to end encrypted messaging apps, like WhatsApp, in an attempt to shield or conceal their communications from law enforcement.

25.     Continued examination of TARGET CELL-1 revealed that on or about August 11, 2025, PROCTOR texts FAMILY MEMBER-2 and states, "honestly, I just want to burn it all down. If there were riots nationwide starting today, I'd join. I'm an anarchist to the bone."  On or about August 24, 2025, PROCTOR again texted FAMILY

MEMBER-2, stating "when the riots happen, I will definitely be part of it".  Two days

prior to this text (August 22, 2025), PROCTOR orders Ninja Tabi Boots. Moreover,

during the first week of September, PROCTOR orders a face hood, stun batons, and

goggles.

## PROCTOR SPEAKS OF REVOLUTION
## PRIOR TO THE ATTEMPTED ARSON

26.     On or about September 5, 2025, slugmag.com published a podcast featuring

PROCTOR as the singer and bass player for The Modifiers.[6]  Agents listened to the

podcast in its entirety.  Here, PROCTOR explains that the Modifiers' latest album is

about "the destruction of the world, the country."  He explains that his band is "very

political, we're very woke, we're woke as fuck."  PROCTOR later stated, "there's got to

be a revolution starting somewhere."  On or about September 10, 2025, a clip of this

podcast was posted on The Modifiers' Instagram account.

## PROCTOR APPEARS TO CONDUCT
## PRE-PLANNING, SURVEILLANCE OR "RECON"

27.     On September 10, 2025, two days prior to the attempted arson, PROCTOR

had a text message exchange with another individual.  In one of the text messages,

PROCTOR stated, "If you really wanna do this with me, I am 1000% serious and

---

[6] According to the website, https://www.slugmag.com/soundwaves/episode-484-the-modifiers/, last visited on
September 24, 2025.

planning in doing recon stuff, and I definitely need help if you're willing." I believe based upon my training and experience, that when PROCTOR is referring to "recon" he is talking about reconnaissance or scouting actions intended to obtain information about the terrain, potential targets, and other information about the potential target and target area.

28.    Further review of PROCTOR's text messages revealed that on or about September 15, 2025 (three days after the attempted arson), PROCTOR texts a friend (WITNESS-1), "Come over . . . I got to tell you something in person. Prepare to have you mind blown." During an interview with WITNESS-1, he/she stated that during their in person meeting with PROCTOR, he openly admitted to setting the destructive device under a vehicle at "Fox News" and that PROCTOR further admitted to lighting the fuse but that it did not blow up.

29.    On September 19, 2025 (seven days after the failed arson attempt) PROCTOR received newly purchased fuse at the SUBJECT RESIDENCE. PROCTOR is observed that same day returning to the INCIDENT LOCATION. Specifically, PROCTOR was observed driving a silver-colored Porsche bearing Utah license plate number ███████ ("███████"). A review of Utah state records indicated that ███████ is currently registered to J███████ B███████ at the SUBJECT RESIDENCE.

30.     PROCTOR departed the SUBJECT RESIDENCE in the Porche and traveled to the vicinity of 1995 S. 4490 W, Salt Lake City, UT, 84104. Shortly thereafter, PROCTOR was observed departing the area and driving to the INCIDENT LOCATION where he was observed driving slowly, passing the Fox 13 building several times before departing and returning to the SUBJECT RESIDENCE.

31.     Because PROCTOR conducts pre-planning, surveillance and reconnaissance, agents believe historical cell site data for TARGET CELL-1 will likely show PROCTOR engaged in such actions prior to May 6, 2025, when FAMILY MEMBER-1 informed PROCTOR that his fuse had arrived and PROCTOR replied, ". . . our operation is getting close now."  PROCTOR's statement to FAMILY MEMBER-1 indicates the "operation" was already conceived or planned.

32.     Considering the above-stated facts, your affiant seeks a warrant for historical cell site data records ranging from April 1, 2025, and continuing until the attempted arson on September 12, 2025, and PROCTOR's arrest on September 20, 2025, when TARGET CELL-1 is seized by law enforcement. Your affiant believes this historical data contains evidence of PROCTOR's pre-planning and reconnaissance activities.

//


//

23

## CELLPHONE DATA

33.     In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

34.     Based on my training and experience, I know that Verizon can collect cell-site data about TAERGET CELL-1.  I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business to use this information for various

business-related purposes. A preservation request was sent to Verizon on September 15, 2025.

35.     Based on my training and experience, I know that Verizon collect per-call measurement data. Specifically, Verizon refers to this data as "real-time tool" or RTT. This data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

36.     Based on my training and experience, I know that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify user or users of TARGET CELL-1 and may assist in the identification of co-conspirators and/or victims.

25

## AUTHORIZATION REQUEST

37.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

38.    I further request that the Court direct Verizon to disclose to the United States any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on Verizon who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

*Chad A. Jones*

CHAD A. JONES
Task Force Officer
Federal Bureau of Investigation
Salt Lake City, Utah

Sworn to before me telephonically or by other reliable
means pursuant to Fed. R. Crim. P. 4.1
at 12:45 pm on October  24, 2025.

HONORABLE DUSTIN B. PEAD
United States Magistrate Judge

26

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to historical records and information associated with a cellular device assigned to ███████0388 (TARGET CELL-1) that are stored at premises controlled by Verizon ("the Provider"), headquartered at 1095 6th Avenue, New York, New York, United States.

27

## **ATTACHMENT B**

## **Particular Things to be Seized**

I.      Information to be Disclosed by Verizon (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pursuant to 18 U.S.C. §§ 2703(d) and 3122-24, and pertaining to the Account listed in Attachment A for the time period from April 1, 2025 to September 20, 2025.

A.      The following information about the account associated with the TARGET CELL-1 described in Attachment A:

1.      Names (including subscriber names, usernames, and screen names);

2.      Addresses (including mailing addresses, service addresses, residential addresses, business addresses, and e-mail addresses);

3.      Records of session times and durations from April 1, 2025, to September 20, 2025.

4.      Length of service (including start date) and types of service utilized.

5.      Telephone or instrument numbers (including model type/numbers, phone numbers, IMSIs, IMEIs, MEIDs, SUPIs, and MAC addresses);

6.      Other subscriber numbers or identities, including any temporarily assigned network addresses (including the registration and session

28

Internet Protocol ("IP") addresses with associated port numbers); and

7.  Means and source of payment for such service (including any credit card or bank account number).

B.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the TARGET CELL-1 described in Attachment A between April 1, 2025, to September 20, 2025, including:

1.  The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination phone numbers); call detail records for voice, Short Message Service (SMS), Multimedia Messaging Service (MMS), Rich Communication Services (RCS) and data; email addresses, and IP addresses;

2.  All non-content dialing, routing, addressing, and signaling information, including all non-content packet switched data, transmitted to or from the TARGET CELL-1,

3.  Information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, including call detail records; and

4.  All location data including timing advance data, per-call measurement data, and other historical location data (including data identified as Range-to-Tower (RTT), LOCDBOR, TrueCall, and similar or associated location-based services); and data generated by a wireless provider to provide emergency dispatchers with the location of a device.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any United States personnel assisting in the

investigation, who may include, in addition to law enforcement officers and agents, attorneys for the United States, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the United States and their support staff for their independent review.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

II.    Information to be Seized by the United States

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 844(i) [Attempted Arson in Interstate Commerce] and 26 U.S.C. § 5861 [Possession of a Destructive Device], involving Christopher Solomon Proctor or unidentified subject(s) during the period of April 1, 2025, to September 20, 2025.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

<u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC</u>
<u>RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE</u>
<u>902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of _____. The attached records consist of _____I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of _____ and they were made by _____ as a regular practice; and

b.      such records were generated by _____ electronic process or system that produces an accurate result, to wit:

        1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of _____ in a manner to ensure that they are true duplicates of the original records; and

        2.      the process or system is regularly verified by _____ and at all times pertinent to the records certified here the process and system functioned properly and normally.

        I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____

Date                        Signature